**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1132-16T4
            A-1133-16T4

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

Z.S. and A.A.,

    Defendants-Appellants.

_____

IN THE MATTER OF H.A., S.A.,
N.A., and L.A., minors.

_____

Submitted May 17, 2018 — Decided July 5, 2018

Before Judges Haas and Gooden Brown.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FN-02-0155-14.

Joseph E. Krakora, Public Defender, attorney for appellant Z.S. (Beth Anne Hahn, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant A.A. (Adrienne Kalosieh, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Arriel Rubinstein, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor H.A. (David Valentin, Assistant Deputy Public Defender, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor S.A. (Todd Wilson, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors N.A. and L.A. (Lisa M. Black, Designated Counsel, on the brief).

PER CURIAM

In these back-to-back appeals, which we consolidate for purposes of issuing a single opinion, defendants Z.S.[1] (mother) and A.A. (father) appeal from the Family Part's September 2, 2014 order, which became final on entry of an October 6, 2016 order terminating the litigation. Following a fact-finding hearing, on September 2, 2014, the trial court determined that defendants abused and neglected their daughter, H.A., born in September, 1997, within the meaning of N.J.S.A. 9:6-8.21(c)(3). Specifically, the court found that A.A. sexually abused H.A. and Z.S. failed to protect her.

---

[1] Pursuant to Rule 1:38-3, we use initials to protect the privacy of the family.

On appeal, both defendants argue the Division of Child Protection and Permanency (Division) failed to prove abuse and neglect by a preponderance of the evidence. In addition, A.A. argues that in terminating the litigation, the court unlawfully restricted his contact with his other children despite finding no evidence that he posed a risk to them. A.A. also argues that the court abused its discretion in denying defendants' Rule 4:50-1 motion to vacate and reconsider the fact-finding order based on newly discovered evidence. The Division opposes the appeal. H.A.'s Law Guardian opposes the appeal as to her father, but "takes no position regarding the finding of neglect against her mother . . . ." Based on our review of the record and the applicable legal principles, we conclude that the court applied the wrong standard in evaluating defendants' motion to reopen the fact-finding hearing. Accordingly, we reverse and remand.

We summarize the facts from the record developed over the course of the six-day fact-finding hearing from June 23 to July 15, 2014, during which the Division presented eight witnesses, including expert witnesses, and the defense presented one witness. The court also admitted numerous documentary exhibits into evidence. The circumstances that led to the Division filing a verified complaint, pursuant to N.J.S.A. 9:6-8.21 and 30:4C-12, for custody of H.A., and care and supervision for her four

siblings, Am.A., born in April 1996,[2] S.A., born in October 1998,[3] N.A., born in April 2007, and L.A., born in January 2009,[4] began on October 9, 2013. On that date, the Division received a referral from the police that H.A., then a sixteen-year-old ninth-grade classified student with a full scale IQ of 81, disclosed to her guidance counselor that her father had sexual intercourse with her in the living room of their home one morning in the summer of 2013. H.A. told the counselor she complained to her mother in September 2013 but her mother did not believe her.

A Division caseworker responded to the Bergen County Prosecutor's Office where H.A. was being interviewed. During the interview, H.A. recanted her allegations and stated she had lied about everything. H.A. explained that she fabricated the allegations because she was upset about her mother slapping her earlier that morning when her mother discovered she had lied about visiting her best friend, C.C., the day before. H.A. had actually spent the time with a "boy," knowing her parents disapproved.

When questioned by the caseworker later that day, Z.S. confirmed that she had slapped H.A. that morning and that H.A. had

---

[2] Am.A. reached the age of majority during the pendency of these proceedings and was dismissed from the litigation.

[3] S.A.'s Law Guardian opposes the appeal as to both A.A. and Z.S.

[4] N.A. and L.A.'s Law Guardian oppose the appeal as to A.A.

A-1132-16T4

disclosed A.A.'s alleged inappropriate touching in September 2013. However, she did not believe H.A. and attributed it to the bad influence of her friends. A.A. also denied the allegations to the caseworker and the other children indicated no concerns. In particular, the oldest child, Am.A., defended her father and explained that H.A. fabricated the allegations for attention.

On November 20, 2013, when the caseworker returned to the home to follow up with the family, H.A. told her she had recanted because of pressure from her mother, confirmed that the sexual abuse had, in fact, occurred, and provided additional details of the incident. H.A. elaborated that when she awoke at approximately 6:00 a.m. one morning in June 2013, she went into the living room where her father was watching television, and initially sat on the couch. Later, while she was lying on the couch, A.A. turned off the lights and the television, covered her with a blanket and touched her vaginal area and breasts under her clothing. H.A. denied any digital or penile penetration but stated A.A. tried to put his tongue into her mouth, but she resisted.

According to H.A., the incident lasted approximately five minutes, during which they both remained fully clothed. Afterwards, A.A. went into the bathroom to smoke a cigarette. At that point, H.A. ran out of the house with her mother's cell phone, called her best friend C.C. and told her what happened. Meanwhile,

A.A. called H.A. several times on her mother's phone but she ignored the calls. When she finally answered the phone, A.A. told her he was "so sorry" and asked why H.A. did not tell him to stop.

After consulting her supervisor, the caseworker transported H.A. back to the prosecutor's office, where she reiterated the allegations. Although H.A. stated she was telling the truth, she did not want to give a sworn statement and she did not want her father to go to jail. After the interview, the Division executed an emergency removal and placed H.A. in a resource home because H.A. did not feel safe returning home due to her mother and her siblings denigrating and vilifying her and accusing her of destroying the family. The Division also implemented a safety protection plan, restricting A.A.'s contact with the other children.

In the course of the ensuing investigation, H.A. recounted the incident with some variances. On December 2, 2013, H.A. told another caseworker that A.A. tried to put his "thing in her mouth," as well as his tongue. She also stated that A.A. put his penis inside her vagina, but she was unsure how long it lasted or whether he ejaculated. On December 13, 2013, during a medical examination, H.A. told a pediatrician specializing in child abuse cases that A.A. touched her with his hand and his penis, that no one was home

at the time of the incident, and that she told C.C.'s mother when it happened.

On December 10, 2013, H.A. underwent a psychosocial evaluation and told the evaluator that the incident began with A.A. removing his boxer shorts, inserting his thumbs into her mouth to separate her jaw and "shov[ing] his penis into her mouth." According to H.A., once A.A.'s penis was "all the way in [her] mouth," he moved it "back and forth." H.A. also disclosed that during the incident, A.A. removed her bra, touched her breasts with his hands, and touched her vaginal area under her clothing with his hand and penis. At one point, H.A. flipped over and A.A. "got on top of [her]" and "went inside" her vagina with his penis, but she was unsure if he ejaculated.

H.A. also told the evaluator that immediately after the incident, she picked up a phone and tried to dial 911 but A.A. threw the phone before she was able to hit send. When A.A. went to smoke a cigarette, she got dressed, grabbed the phone and ran to her friend's house, ignoring the incoming telephone calls from A.A. When she finally answered the phone, A.A. asked her why she ran away and begged her to come home. After she agreed, A.A. picked her up in his car, apologized to her, and told her to stop him in the future. H.A. told the evaluator that following the

incident, she received preferential treatment from A.A. and was relieved of her usual chores.

At the fact-finding hearing, the guidance counselor, C.C. and C.C.'s mother testified about H.A.'s disclosures to them. The guidance counselor, who described H.A. as attention-seeking and academically challenged, confirmed that on October 9, 2013, on her friends' prompting, H.A. disclosed to her that early one morning in June 2013, her father "put his private part into her private part," but she "clenched her legs shut," ran out and called her friend, C.C.

C.C.'s mother testified that some time in June 2013, her telephone rang at approximately 6:00 a.m. When she heard H.A.'s voice on her answering machine imploring C.C. to answer her phone calls because she "ran away from home," C.C.'s mother answered the phone. Upon learning H.A.'s location, she arranged to pick her up. However, when she arrived, H.A. was not there, and she later learned from H.A. that she had run away from home because her father molested her. C.C. also testified that H.A. told her later that same day that her father had "raped" her and had done "things" to her, but she did not press H.A. for details because she did not want to upset her.

H.A. testified at the fact-finding hearing that towards the end of June 2013, about two weeks after school ended but before

Ramadan began, she was "raped" by her father. According to H.A., she had stayed up all night watching television on one of the living room couches, which was typical for her on summer breaks. Her father was also up all night and was seated on a different living room couch, browsing social media while he charged his phone. Her other family members were at home, but asleep. At approximately 6:00 a.m., her father turned off the television and the hallway light, and closed all the bedroom doors in proximity to the living room. He then removed his underwear, used his finger to force open her clenched teeth, inserted his erect penis into her mouth, and proceeded to "go[] back and forth with it." H.A. testified she was in shock and turned over on the couch, at which point her father unstrapped her bra and "started playing with [her] boobs" under her shirt while attempting to "get[] his penis in [her] vagina," but failing to do so.

After the incident, when her father walked over to the window and gazed outside, H.A. grabbed her mother's cell phone and began dialing 911. However, her father returned the phone to the charger before she was able to complete the call and went into the bathroom to smoke a cigarette. At that point, H.A. changed her clothes, took her mother's phone again, and ran out of the house. Once outside, she frantically called C.C. repeatedly. Eventually, when C.C.'s mother answered the phone, H.A. told her that her father

had raped her and begged her for help. Although C.C.'s mother agreed to pick H.A. up at the local post office, H.A. went to a different location.

Meanwhile, A.A. called Z.S.' phone many times, but H.A. ignored the calls. When H.A. finally answered the phone, he apologized and begged her to come home. H.A. hung up but ultimately answered the phone again when he called back repeatedly and arranged for him to pick her up. During the car ride home, A.A. apologized again and told her to stop him in the future. When she arrived home, she sent a text message to C.C.'s mother telling her she was home and everything was fine. H.A. testified that after the incident, she received preferential treatment from her parents by being relieved of her usual chores and allowed to go to a water park with C.C.'s family over the summer.

To corroborate H.A.'s testimony, the Division produced phone records of all incoming and outgoing telephone calls for Z.S.' phone for the months of June and July 2013. The records indicated that on June 24, 2013, between 6:11 a.m. and 6:40 a.m., there were twelve outgoing calls to C.C.'s home phone number. Between 6:38 a.m. and 6:44 a.m., there were three incoming calls from A.A.'s cell phone number.

According to H.A., her disclosure to her mother in September 2013 followed a heated argument about enrolling in a school program

A-1132-16T4

for academically challenged students and attending a school dance, neither of which her mother would allow. She also confirmed that her disclosure in October 2013 followed another argument during which her mother had slapped her for lying about visiting C.C. She acknowledged that she had trouble dealing with her parents' strict rules in her home and the restrictions of her Islamic religion and culture, but insisted that she was telling the truth. She rejected the assertion that her allegations were motivated by retribution or rebellion. She expressed genuine concern for her family and insisted that she would never lie about something of this magnitude. She explained that despite the fact that her home felt like a "jail," she would love to go home if she knew her family supported her. When confronted with the inconsistencies in her disclosures and her recantation, she confirmed that her mother forced her to recant the allegations in October 2013 and dismissed inconsistencies as inaccurate or immaterial.

During the fact-finding hearing, the Division presented expert testimony on the Child Sexual Abuse Accommodation Syndrome (CSAAS), to describe the constellation of factors common to sexually abused children, namely, secrecy, helplessness, coercion or accommodation, delayed or unconvincing disclosure, and recantation. The expert opined that neither multiple recantations nor the absence of grooming were fatal to a finding of child sexual

11

abuse. The Division also presented expert testimony in relation to H.A.'s psychosocial evaluation, which found clinical support for sexual abuse, meaning that professional treatment for H.A. was recommended. The finding was based on H.A.'s "marked shift in affect" when discussing the abuse, her reported feelings of isolation, her spontaneous disclosure which was rich with idiosyncratic detail, and her fairly consistent recitation of core details of the incident. The expert noted H.A.'s lack of sexual knowledge, given her characterization of any form of sexual contact as rape, and opined that her inconsistencies were reflective of piecemeal disclosures that were directly influenced by the level of support she received from the adult to whom she was making the disclosure.

The defense presented the testimony of Am.A., who maintained her defense of her father and continued to discredit H.A.'s account. Am.A. testified that her father was not capable of sexual assault and attributed the allegations to H.A.'s defiance and the negative influence of her friends. Am.A. also contradicted peripheral details of H.A.'s account to demonstrate that her father was never alone with H.A. in the house.

Following the hearing, the court issued a seventy-nine page written opinion and conforming order, finding that the Division proved by a preponderance of the evidence that defendants had

abused and neglected H.A. The court found the Division's witnesses credible, including H.A., whom the court found "to be a very credible witness, given her demeanor, her tone, her eye contact, and the forthright manner in which she answered questions." The court based its finding of abuse and neglect on H.A.'s "credible testimony, the phone records and witness testimony supporting her story" and the uncontroverted expert testimony.

The court "note[d] that of the ten people and/or groups H.A. told about the incident, she told six of them that her father touched her breasts and her vagina. The remaining four individuals . . . did not testify or otherwise document H.A.'s disclosure in great detail." Further, "she told five of them that she left the house to call C.C., and two of them . . . confirmed that the calls were in fact placed. The remaining three individuals . . . did not testify or otherwise document H.A.'s disclosure in great detail."

In addition, the court determined that "the credible and overwhelming testimony concerning what happened in the aftermath of the abuse," combined with the "cold, hard record of these frantic phone calls being made" "dispel any doubt as to whether something terrible happened at the end of June 2013. Simply stated, no one makes twelve consecutive phone calls to their best friend's house phone between 6:11 a.m. and 6:40 a.m. unless they

13

are in distress." (emphasis omitted). The court was also "persuaded by what happened to H.A. in the days and weeks following the abuse" in terms of the reported preferential treatment and found it "highly credible in terms of their tendency to create an inference of a guilty conscience."

The court rejected the defense theories that H.A.'s disclosures were motivated by anger at her strict parents, defiance of her Islamic practices or a desire for attention. In this regard, the court found Am.A.'s "testimony to be not credible" because "[a]s a parentified older sibling, she had the same biased attitude as her parents . . . ." As to the specific attacks on her credibility, the court determined that "H.A.'s delay in reporting, her piecemeal disclosures, her recantations, and her 'inconsistencies' [were] not fatal to [the court's] finding[,]" but were "quite easily explained by CSAAS." Further, the court found the inconsistencies in H.A.'s disclosures pertained to inconsequential peripheral facts, as opposed to "core" details. The court was also persuaded that the "changing disclosures" regarding A.A. inserting his penis into H.A.s mouth "correlated with the level of comfort that H.A. perceived as she continued to tell her story." Further, according to the court, the inconsistency about whether A.A. penetrated her vagina with his penis reflected H.A.'s "very crude understanding of human sexual

behavior" and her preoccupation "with learning whether she [was] still a virgin."

After the hearing, in March 2015, defendants moved pursuant to Rule 4:50-1 to vacate the fact-finding order based on newly discovered evidence. Specifically, A.A.'s counsel asserted that on June 22, 2014, immediately prior to the commencement of the fact-finding hearing, H.A. made similar allegations to her friend C.C. while she was at the resource home, accusing four boys of raping her by forcing her to perform oral sex and then recanting the allegations. A.A.'s counsel explained that on June 23 and 24, 2014, after the fact-finding hearing was underway, both defendants requested information from the Division regarding the new allegation but were advised the information was not available due to an ongoing police investigation.

However, according to A.A.'s counsel, upon recently inspecting the file, she discovered a June 22, 2014 Special Response Unit (SPRU) report, detailing the Division's investigation of the new allegation, that was never provided to defendants during the trial.[5] The SPRU report concluded that H.A.

_____

[5] A.A.'s counsel's inspection of the file apparently occurred in connection with another recantation of H.A.'s allegations against A.A. contained in an e-mail H.A. purportedly sent to her brother several months after the fact-finding hearing. On appeal, A.A.

was safe and indicated that the Hudson County Prosecutor's Office "declined to take the case."[6]  A.A.'s counsel asserted that because the Division withheld the information, the experts were unable to consider the new allegation and recantation in evaluating H.A., and the defense attorneys were unable to cross-examine H.A., whose credibility was central to the court's finding.  Defendants therefore urged the court to vacate the fact-finding order and re-open the fact-finding record to consider the new evidence.

On June 17, 2015, the court issued a written decision and memorializing order denying defendants' motion, finding no basis to vacate the September 2, 2014 fact-finding order.  The court also found no basis to conduct a plenary hearing because there was no dispute that the SPRU report existed.  After incorporating the

does not advance any arguments concerning that alleged recantation.

[6]  During the June 24, 2015 colloquy with the court, the Division's attorney objected to turning over the SPRU report, asserting that the Division was in the middle of the investigation, and the report was "not discoverable."  When the court directed that the Division produce the report by June 27, 2015, the Division's attorney indicated that the investigation would probably not be completed by that time because "[t]he prosecutor's office [was] involved" and "[t]here [were] other interviews that need[ed] to take place with other individuals."  Ultimately, the court ordered the Division to turn over the SPRU report immediately upon completion or "provide to defense counsel the name of the SPRU worker conducting the investigation" so that the worker could be subpoenaed to testify if the report was not available.  However, the report was never produced during the fact-finding hearing and the SPRU worker never testified.

factual findings detailed in the September 2, 2014 written decision, the court concluded that "under any of the subsections of [Rule] 4:50-1," the SPRU report would not have "altered the result of the trial" because "[d]efendants were given ample opportunity to cross-examine [H.A.] during the fact finding hearing."

The court noted it was persuaded by "the Division's arguments that the SPRU report [was] irrelevant and inadmissible at trial because it [did] not establish that [H.A.] made false statements" or "fabricated" the new allegations. The court elaborated further:

> [t]he allegations referenced in the SPRU report were known to the defendants at the time of the fact[-]finding hearing and occurred a full year after the incident which form[ed] the basis of the fact[-]finding. The SPRU report is not probative of the issues presented by the fact[-]finding. Clearly, [H.A.] is a troubled child who, the record shows has been traumatized by the events detailed in the court's September 2, 2014 opinion. At the time of the allegations mentioned in the SPRU report, the child had been in foster care for approximately nine months. Moreover, the record made at the fact[-]finding reflects that she was experiencing psychiatric issues.[7] . . . All of these facts were known by the defendants at the time of the fact[-]finding hearing.

---

[7] Indeed, immediately prior to the commencement of the fact-finding hearing, H.A. was hospitalized at the psychiatric unit of the Hoboken Medical Center suffering from major depression. She was released during the course of the trial and permitted to testify after the court conducted a testimonial hearing to determine whether H.A. was medically cleared to testify.

This appeal followed.

On appeal, defendant A.A. asserts that evidence of H.A.'s "pattern of alleging and recanting sexual assault casts doubt on [her] ability to testify truthfully" that would "have affected the result, had it been heard." (emphasis omitted). Defendant argues that the court "abused its discretion not to vacate and reconsider the fact-finding decision based on this newly uncovered evidence" as permitted under Rule 4:50-1. However, given the procedural posture of the case, we conclude that Rule 4:50-1 and its enhanced requirement for proof of "exceptional and compelling circumstances" to warrant relief, Baumann v. Marinaro, 95 N.J. 380, 393 (1984), was not the proper legal standard to apply in the circumstances presented here.

It is well established that "the trial court has the inherent power, to be exercised in its sound discretion, to review, revise, reconsider and modify its interlocutory orders at any time prior to the entry of final judgment." Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257 (App. Div. 1987). In Lombardi v. Masso, 207 N.J. 517, 536-37 (2011), our Supreme Court acknowledged that

> where a litigation has not terminated, an interlocutory order is always subject to revision where the judge believes it would be just to do so. The rules governing final

> judgments, for example, that evidence must be newly discovered to be considered, <u>R.</u> 4:50-1(b), do not apply in the interlocutory setting. Nor is the judge constrained, as would a reviewing court be, by the original record.
>
> [<u>Id.</u> at 536-37.]

Thus, "the stringent constraints imposed on final judgments and orders under <u>Rule</u> 4:50-1 . . . are wholly inapplicable to interlocutory orders." <u>Id.</u> at 534. "Indeed, '[a] significant aspect of the interlocutory nature of an order is its amenability to the trial court's control until entry of final judgment without interposition of considerations appropriate to finality.'" <u>Id.</u> at 534-35 (alteration in original) (quoting Pressler & Verniero, <u>Current N.J. Court Rules</u>, comment 3 on <u>R.</u> 4:42-2 (2011)).

Thus, "[i]nterlocutory orders are always subject to revision in the interests of justice." <u>Id.</u> at 536. "That entitlement to change a prior ruling in the interests of justice is what distinguishes an interlocutory order from a final judgment." <u>Id.</u> at 537. However, "the power to reconsider an interlocutory order should be exercised 'only for good cause shown and in the service of the ultimate goal of substantial justice.'" <u>Ibid.</u> (quoting <u>Johnson</u>, 220 N.J. Super. at 263-64). <u>See</u> <u>Ford v. Weisman</u>, 188 N.J. Super. 614, 619 (App. Div. 1983) (holding court "has complete

power over its interlocutory orders and may revise them when it would be consonant with the interests of justice to do so").

Here, we do not fault the court because the defense attorneys expressly sought relief under Rule 4:50-1. Nonetheless, we are constrained to reverse and remand for reconsideration under the appropriate standard. Because of our conclusion, we need not address defendants' remaining arguments and take no position on the ultimate outcome of the case following the remand.

Reversed and remanded for reconsideration consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION